Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SAMUEL I. KOENIG, Derivatively on Behalf of ENOCHIAN BIOSCIENCES INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>SERHAT GUMRUKCU, RENE SINDLEV, MARK DYBUL, CAROL BROSGART, GREGG ALTON, JAMES SAPIRSTEIN, CARL SANDLER, HENRIK GRONFELDT-SORENSON, and JAYNE MCNICOL, )<br><br>Defendants, )<br><br>and )<br><br>ENOCHIAN BIOSCIENCES INC., )<br><br>Nominal Defendant. ) | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Samuel I. Koenig ("Plaintiff"), by his undersigned attorneys, respectfully submits this Verified Stockholder Derivative Complaint for the benefit, and on behalf of, nominal defendant Enochian Biosciences Inc. ("Enochian" or the "Company") against the Defendants for breaches of fiduciary duty and violations of the federal securities laws. Plaintiff makes these allegations upon personal knowledge with respect to himself and, as to all other matters, upon information and belief developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, filings by Enochian with the U.S. Securities

1

and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, and other public information regarding Enochian. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.     This is action is brought derivatively on behalf of Enochian to recover its substantial damages caused by the misconduct pled herein and to remediate its internal control weaknesses and deficient corporate governance practices and procedures.

2.     Enochian was formed in 2018 as part of a business partnership forged between Defendants Rene Sindlev ("Sindlev") and Serhat Gumrukcu ("Gumrukcu").  It was represented that Enochian was engaged in developing technology for the treatment of HIV/AIDS, hepatitis B virus, influenza, coronavirus, and cancer based upon the scientific research of Gumrukcu. In exchange for a perpetual license for technologies from entities controlled by him, Gumrukcu obtained 50% ownership in Enochian.

3.     In public statements and filings with the SEC, Enochian extolled Gumrukcu as the "genius" "inventor"[1] of the technology and science fueling the Company's product pipeline.  All told, Gumrukcu has been paid over $20 million by Enochian in connection with licensing and other contractual agreements between him, entities controlled by him, and the Company.

4.     The lie was given to the Board's and Company's representations about Gumrukcu and his scientific "genius" when, on June 1, 2022, Hindenburg Research published a report based upon extensive research and interviews of multiple former employees and industry experts (the "Hindenburg Report") exposing Gumrukcu as a con-artist with a long rap-sheet, possessing *none* of his claimed credentials.  The Hindenburg Report revealed that Gumrukcu was *not* and was *never* a licensed medical (or any other kind of) doctor in any jurisdiction.   To the contrary, he had

---

[1]     *See, e.g.,* Enochian's Current Report on Form 8-K filed with the SEC on November 25, 2019, the attached press release, and Enochian's Annual Report on Form 10-K filed with the SEC on September 24, 2021 for the fiscal year ended June 30, 2021.

purchased a fake Russian medical degree on the black market and "was arrested based on accusations of falsely posing as a doctor" in Turkey in 2012.  Gumrukcu had not only falsified his credentials, but also had a record of fraudulent financial transactions. Indeed, in February 2017, he was arrested after the State of California accused him of a slew of crimes, including fraud, identity theft, and check kiting—a total of 14 felonies.

5.      Recently, however, it has come to light that Gumrukcu's criminality extends well beyond fraud to include conspiracy to commit murder, when he was arrested for a conspiracy to murder a former partner in an oil deal who accused Gumrukcu of fraud. The former partner's fraud case was coming to trial at the same time that the deal by which Enochian was formed was undergoing due diligence. Prosecutors allege that, in order to keep his fraudulent conduct hidden so that it did not  prevent consummation of the lucrative deal, Gumrukcu conspired to have the former partner killed.

6.      Incredibly, according to the Hindenburg Report, Enochian Board members knew—but concealed—Gumrukcu's criminal history from investors. In a phone interview, Defendant Sindlev admitted to knowing that Gumrukcu had been charged with 14 felony counts, but nevertheless moved forward with the deal to form Enochian and subsequently bring it public and even expanded further on the relationship between Enochian and Gumrukcu thereafter, awarding additional lucrative cash consulting and licensing contracts to Gumrukcu and entities controlled by him and his spouse. Though Gumrukcu's criminal past was known, no disclosure was made. Instead, a steady stream of positive comments regarding Gumrukcu and his purported work was fed to stockholders.

7.      The facts contained in the Hindenburg Report sent Enochian shares spiraling downward by nearly 50%. Following the precipitous stock drop, securities  class action lawsuits were swiftly filed against Enochian, its directors, and officers, among others, alleging violations of the anti-fraud provisions of the federal securities laws. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers and directors.

8.      The material damage caused to Enochian and its shareholders was the result of the Enochian board's approval of, or acquiescence in, the retention of Gumrukcu and payment of more than $20 million to him and entities controlled by him. The current and former members of Enochian's Board ignored numerous red flags warning them that Gumrukcu was a fraud and that statements made about him and his purported scientific efforts were false and misleading and omitted material information.

9.      Internally, the Company's then-CEO, Eric Leire, MD ("Leire"), found that little could be verified about Gumrukcu's work regarding the drugs licensed by Enochian and Leire began to suspect that Gumrukcu had fabricated his resumé and held neither a medical degree nor a doctoral degree. Leire, a medical doctor and pharmaceutical-industry executive, said he was fired from his CEO job in 2019 after raising his concerns with the Enochian Board.

10.     Further red flags were raised when, on November 19, 2019, *Seeking Alpha* published a research report on Enochian, authored by White Diamond Research, demonstrating that Gumrukcu had very little scientific experience and no published scientific papers. White Diamond Research reported that Gumrukcu was not listed as a student at the medical school he claimed to attend and that his claimed medical studies underlying Enochian's drug development were not published in a peer-reviewed journal. "He considers himself a mystic, performs magic tricks, and was accused of identity theft, grand theft, false impersonation and plead guilty to commercial burglary in Los Angeles in 2018." According to the White Diamond Research Report, Gumrukcu was arrested in 2017, held on $625,000 bail, charged with grand theft, false impersonation, identity theft, commercial burglary, and more in Los Angeles from 2014 through 2016, pleaded no contest to commercial burglary in January 2018, and was sentenced to five years of probation.

11.     On May 9, 2020, the Danish publication *DR Viden* raised more red flags regarding Gumrukcu, reporting that several Danish doctors with knowledge of Gumrukcu's clinic stated that there was no scientific evidence supporting the conclusion that the treatments Gumrukcu was offering actually worked and, furthermore, Gumrukcu was not permitted to treat patients in his

clinic because he was not a licensed physician.  Moreover, *DR Viden* reported that the family of at least one person that Gumrukcu treated was suing him after Gumrukcu's treatments of leeches, mistletoe extract, and so-called nck treatment, which is a form of immunotherapy against cancer, ended in the patient's death.  *DR Viden* reported that numerous Danish doctors said that patients should not be treated by Gumrukcu at his clinic.

12.     The Individual Defendants, however, failed to act in the face of these red flags. Had they timely acted in accordance with their fiduciary duties, the damage caused to Enochian and its shareholders would have been prevented, or at least minimized. As a result of the Defendants' breaches of fiduciary duty, and other misconduct, Enochian has sustained substantial damages and irreparable injury to its reputation. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the control weaknesses that plague Enochian.

13.     Plaintiff did not make a demand prior to bringing this action because it would be futile and is thus excused. The Company's directors are neither disinterested nor independent. In the absence of this action, Enochian will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because Plaintiff's claims raise a federal question under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78t(a) and 78t-1(a).

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     This Court has jurisdiction over each Defendant named herein because Enochian maintains its headquarters and does substantial business in this District and, as such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the

exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), where the Company maintains its headquarters and where it conducts substantial business.

## III.    PARTIES

### A.    Plaintiff

19.     Plaintiff Samuel I. Koenig is a current Enochian stockholder, having purchased Enochian shares on November 26 and December 10, 2021, and having continuously held those shares since his purchases. As such, Plaintiff held Enochian stock at the times of transactions complained of herein.

### B.    Defendants

#### 1.    Nominal Defendant Enochian Biosciences Inc.

20.     Nominal Defendant Enochian is a corporation duly incorporated under the laws of the State of Delaware and is headquartered at 4142 Lankershim Boulevard, North Hollywood, California 91602. Enochian's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "ENOB." Enochian is a biopharmaceutical company dedicated to identifying, developing, manufacturing, and commercializing gene-modified cell therapy.

#### 2.    Defendant Gumrukcu

21.     Defendant Gumrukcu is a co-founder, and a controlling shareholder of Enochian. According to the 2022 Proxy Statement filed by Enochian with the SEC on January 27, 2022 (the "2022 Proxy Statement"), Gumrukcu owned 9,551,075 shares of Enochian common stock, or 18.15% thereof.

#### 3.    Individual Defendants

##### a.    Defendant Sindlev

22.     Defendant Sindlev is a co-founder of Enochian and the Board Chair since June 2018. He is an investor and entrepreneur since 1997 through several holding companies, including RS

Group ApS, RS Arving ApS, RS Family ApS, RS Newton ApS, and RS Bio ApS. In January 2014, he established Dr. Smood ApS in Denmark, and Dr. Smood Group, Inc. in the United States, a chain of USDA Certified Organic restaurants, and since 2014 he has served as Chair. According to the 2021 Proxy Statement filed by Enochian with the SEC on February 3, 2021 (the "2021 Proxy Statement") and the 2022 Proxy Statement, he received the following compensation:

|  | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $45,000 | $29,462 | $74,462 |
| 2020 | $45,000 | $31,345 | $76,345 |

23.     As of January 24, 2022, Sindlev owned 9,702,808 shares of Enochian common stock, or 18.42% thereof.

**b.     Defendant Dybul**

24.     Defendant Mark Dybul ("Dybul") is Enochian's Chief Executive Officer ("CEO") and principal executive officer since July 20, 2021, Executive Vice Board Chair since January 2019, and a director since February 2018.  According to the 2021 and 2022 Proxy Statements, he received the following compensation:

|  | Fees Earned or Cash Payments | Stock/Option Awards | Totals |
|---|---|---|---|
| 2021 | $430,000 |  | $430,000 |
| 2020 | $430,000 | $832,000 | $1,262,500 |

**c.     Defendant Brosgart**

25.     Defendant Carol Brosgart ("Brosgart") is an Enochian director since December 2019. Brosgart is a member of the Nominating and Corporate Governance Committee. Previously, she served as a board member of Tobira Therapeutics, Inc. ("Tobira"), from September 2009 until November 2016. Brosgart is the Chair of the Scientific Advisory Committee for Hepion Pharmaceuticals, Inc. (formerly ContraVir Pharmaceuticals, Inc. ("ContraVir")), a biotechnology company.

26.     According to the 2021 and 2022 Proxy Statements, Brosgart received the following compensation:

|      | Fees Earned or Cash Payments | Stock/Option Awards | Totals |
|------|------------------------------|---------------------|--------|
| 2021 | $69,000                      | $49,856             | $118,856 |
| 2020 | $34,500                      | $43,297             | $77,797 |

27.     As of January 24, 2022, Brosgart owned 41,049 shares of Enochian common stock.

**d.     Defendant Alton**

28.     Defendant Gregg Alton ("Alton") is an Enochian director since December 2019. Alton is the Chair of the Nominating and Corporate Governance Committee. According to the 2021 and 2022 Proxy Statements, Alton received the following compensation:

|      | Fees Earned or Cash Payments | Stock/Option Awards | Totals |
|------|------------------------------|---------------------|--------|
| 2021 | $77,500                      | $49,856             | $127,356 |
| 2020 | $38,750                      | $43,297             | $82,047 |

29.     As of January 24, 2022, Alton owned 41,049 shares of Enochian common stock.

**e.     Defendant Sapirstein**

30.     Defendant James Sapirstein ("Sapirstein") is an Enochian director since March 2018. Sapirstein is the Chair of the Compensation Committee and a member of the Audit Committee. According to the 2021 and 2022 Proxy Statements, Sapirstein received the following compensation:

|      | Fees Earned or Cash Payments | Stock/Option Awards | Totals |
|------|------------------------------|---------------------|--------|
| 2021 | $77,500                      | $50,730             | $128,230 |
| 2020 | $80,500                      | $43,467             | $123,967 |

31.     As of January 24, 2022, Sapirstein owned 75,502 shares of Enochian common stock.

### f.      Defendant Sandler

32.      Defendant Carl Sandler ("Sandler") is a co-founder of Enochian and served as a director from February 2018 until March 2022. He is a former business partner of Gumrukcu, as one of the two managers of Weird Science, LLC. According to the 2021 and 2022 Proxy Statements, Sandler received the following compensation:

|      | Fees Earned or Cash Payments | Stock/Option Awards | Totals |
|------|------------------------------|---------------------|--------|
| 2021 | $45,000                      | $30,433             | $75,433 |
| 2020 | $45,000                      | $42,745             | $87,745 |

33.      As of January 24, 2022, Sandler owned 8,480,763 shares of Enochian common stock, or 16.10% thereof.

### g.      Defendant Gronfeldt-Sorensen

34.      Defendant Henrik Grønfeldt-Sørensen ("Grønfeldt-Sørensen") is an Enochian director since October 2017, CEO of RS Group ApS, RS Arving ApS, RS Family ApS and RS Newton ApS since October of 2012, and a director of Dr. Smood Group, Inc. since January 2014. According to the 2021 and 2022 Proxy Statements, Grønfeldt-Sørensen received the following compensation:

|      | Fees Earned or Cash Payments | Stock/Option Awards | Totals |
|------|------------------------------|---------------------|--------|
| 2021 | $45,000                      | $29,114             | $74,114 |
| 2020 | $45,000                      | $40,021             | $85,020 |

35.      As of January 24, 2022, Gronfeldt-Sorensen owned 77,269 shares of Enochian common stock.

### h.      Defendant McNicol

36.      Defendant Jayne McNicol ("McNicol") is an Enochian director and Chair of its Audit Committee since May 2021. According to the 2022 Proxy Statement, McNicol received the following compensation:

| | Fees Earned or Cash Payments | Stock/Option Awards | Totals |
|---|---|---|---|
| 2021 | $7,418 | $105,542 | $112,960 |

37.     Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Grønfeldt-Sørensen, McNicol, and Sandler are referred to herein as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers and/or directors of Enochian and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe and owed Enochian and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Enochian in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Enochian and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

39.     To discharge their duties, the officers and directors of Enochian were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company.

40.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete and truthful information concerning Enochian's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts described so that the market price of the Company's shares would be based upon accurate information.

41.     At all times relevant, the Individual Defendants were the agents of each other and Enochian and were always acting within the course and scope of such agency.

42.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Enochian.

**A.     Additional Duties Under The Code Of Ethics And Conduct**

43.     The Company maintains a Corporate Code of Ethics and Conduct (the "Code of Ethics").  The Code of Ethics sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Enochian and its subsidiaries.

44.     The Code  of Ethics requires:

- compliance with all applicable government laws, rules and regulations and to bring lapses or violations to light;

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that Enochian files with, or submits to, the SEC or any other governmental agency and in other public communications;

- the prompt internal reporting of violations of [the Code of Ethics]; and

- accountability for adherence to [the Code of Ethics].

45.     The Code of Ethics requires directors, officers and employees to promptly provide information related to public disclosures:

> Depending on their position with the Company, employees, officers or directors may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable. The Company expects all of its personnel to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

46.     The Code of Ethics details the Company's policy against insider trading:

> It is illegal for any person, either personally or on behalf of others, (i) to buy or sell securities while in possession of material nonpublic information…. All directors, officers, employees … must comply with these "insider trading" restrictions.

47.     The Code of Ethics requires that all violations be reported and represents that failure to do so is a "severe disciplinary matter," that could result in termination:

> Employees officers and directors should promptly report to the Compliance Officer any conduct that the individual believes to be a violation of law or business ethics

or of any provision of the Code [of Ethics]. Violations, including failures to report potential violations by others, will be viewed as a severe disciplinary matter that may result in personnel action, including termination of employment:

48.     Finally, the Code of Ethics requires:

Compliance with the Law.  All Employees and Directors are expected to comply with all applicable laws, rules and regulations.

Compliance and Reporting.  Employees and Directors are expected to comply with this Code and its underlying policies and procedures to protect the Company and its Employees and Directors from criticism, litigation or embarrassment that might result from alleged, perceived or real conflicts of interest or unethical practices. Violations of this Code are grounds for disciplinary action up to and including discharge and possible legal prosecution.

**B.     Additional Duties Of The Members Of The Audit Committee**

49.     The Company's Audit Committee is specifically tasked with oversight responsibilities assessing, among other things, the quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the implementation and effectiveness of the Corporation's ethics and compliance program, and preparation of all reports required to be included in the Company's proxy statements.

50.     Pursuant to the Audit Committee Charter, other Audit Committee Member duties and responsibilities include:

- Consider and review with the independent auditors and management the integrity of the Company's financial reporting processes, both internal and external, including the adequacy and effectiveness of the Company's internal controls;

- Discuss with management and the independent auditors the Company's guidelines and policies with respect to risk assessment and risk management and the Company's major financial risk exposures and the overall steps management has taken to monitor and control such exposures;

- Review of the Company's anti-fraud controls, and policies and procedures in place to ensure compliance with the Foreign Corrupt Practices Act; and

- Report regularly to the full Board, including with respect to any issues that arise with respect to the quality or integrity of the Corporation's financial statements and the Corporation's compliance with legal or regulatory requirements.

C.     **Additional Duties Of The Members Of The Nominating And Governance Committee**

51.     The members of the Nominating and Governance Committee have additional duties outlined in the Nominating and Corporate Governance Committee Charter, which include:

- Developing and recommending to the Board the Corporate Governance Guidelines for the Corporation and overseeing compliance with such Guidelines;

- Reviewing and reassessing the adequacy of such Corporate Governance Guidelines and recommending any proposed changes to the Board; and

- Monitoring compliance with the Corporation's Code of Ethics and Conduct, which includes reviewing with counsel the adequacy and effectiveness of the Corporation's procedures to ensure proper compliance with such Code of Conduct and Ethics.

V.     **SUBSTANTIVE ALLEGATIONS**

A.     **Background**

52.     Enochian is a pre-clinical stage biotechnology company engaged in the research and development of pharmaceutical and biological products for the treatment of human immunodeficiency virus ("HIV"), hepatitis B virus ("HBV"), influenza and coronavirus infections, and cancer.

53.     Defendant Gumrukcu and Defendant Sindlev began a business partnership in 2016, after Gumrukcu was introduced to Sindlev by a mutual friend.[2]

54.     In April 2017, Gumrukcu founded Gumrukcu Health LLC and within weeks he was hired as a consultant by DanDrit Biotech USA Inc. ("DanDrit"), a drug developer backed by Sindlev.

55.     Gumrukcu then helped form two separate, but related, entities, Seraph Research Institute ("SRI") and Seraph Medical.  SRI, served as a headquarters for Gumrukcu's purported medical research.  The other entity, Seraph Medical, was a treatment center.   Together, SRI and

---

[2]     Caleb Hannan, *Enochian Biosciences: Stunning Murder Allegations Raise Fresh Questions about Company's Top Medical Mind, ShareSleuth*, https://sharesleuth.com/enochian-biosciences-stunning-murder-allegations-raise-fresh-questions-about-companys-main-medical-mind/ (last visited on September 7, 2022).

Seraph Medical, acted as an "incubator" for the creation of Enochian Biopharma Inc., the precursor to the Company.

56.     By July 2017, DanDrit and Sindlev were in talks for a deal with another of Gumrukcu's companies, Weird Science LLC ("Weird Science"). Dandrit would purchase a perpetual license in Weird Science's intellectual property from Gumrukcu, acquire Enochian Biopharma, Inc., and create a new entity, Enochian Biosciences Inc., that would seek to commercialize Gumrukcu's treatment technologies.

### B.     The Formation Of Enochian

57.     On January 17, 2018, DanDrit announced the acquisition of Enochian Biopharma, Inc.  According to Eric Leire ("Leire"), DanDrit's President and CEO, "[t]his acquisition demonstrates our deep commitment to continuing to invest in future innovation in the field of cellular therapy and we believe Enochian's technology will enhance our efforts to improve care for people with HIV and advanced cancers."  In the press release, it was represented that the purchase brought DanDrit a new proprietary technology platform including "combinatory gene therapy methods in the field of HIV/AIDS[, . . . which] will enhance DanDrit's research and development efforts in cellular therapy and add to its pipeline, which also includes cellular immune-oncology products for the prevention of relapse of metastatic colon cancer after resection and chemotherapy."

58.     In the press release, it was disclosed that the acquisition was subject to the condition that Enochian execute a perpetual, sole and exclusive license with Gumrukcu's entity, Weird Science:

> Enochian will have executed a perpetual, sole and exclusive license with Weird Science LLC to use all of Weird Science LLC's intellectual property rights in its proprietary technology for the prevention, treatment and amelioration of HIV in humans, including an assignment of the rights to experimental studies with syngeneic and humanized mice models, and DanDrit will be satisfied with all due diligence related to such intellectual property, [and] DanDrit, Weird Science LLC and a certain stockholder of DanDrit will have entered into an Investor Rights Agreement and a Standstill & Lock-Up Agreement . . . .

14

59.     On February 19, 2018, DanDrit issued a press release announcing completion of the Enochian acquisition and the change of DanDrit's name to Enochian BioSciences Inc., stating: "As a result of the Acquisition, DanDrit owns a perpetual, fully paid up, royalty free, sublicensable, exclusive, license to new technology platforms for the treatment of HIV, including combinatory gene therapy models[.]"

60.     On May 15, 2018, Enochian filed with the SEC a Quarterly Report on  Form 10-Q for the period ended March 31, 2018 (the "1Q18 10-Q") disclosing that, among other things, "[o]n February 16, 2018, the [Company] entered into a consulting agreement with Weird Science under which Weird Science will provide ongoing medical services related to the development of the Company's products for the treatment of HIV and cancer."

61.     On July 2, 2018, Leire wrote in a letter to shareholders that, before completing the acquisition of Enochian Biopharma, Inc., "we engaged in due diligence to assess the value of its proprietary technology related to the treatment of HIV." According to Leire, the due diligence included "our internal evaluation of the viability of the technology, an evaluation by intellectual property counsel on the intellectual property rights associated with such technology, and an independent valuation on the technology."

C.     **Enochian Discloses Material Weaknesses In Its Internal Controls**

62.     On May 15, 2018, Enochian filed with the SEC the 1Q18 10-Q stating that then-CEO Leire and then-Chief Financial Officer ("CFO") Robert Wolfe ("Wolfe") determined the Company's disclosure controls and procedures were not effective due to deficiencies related to inadequate resources to address complex accounting issues. The 1Q18 10-Q disclosed that despite hiring "consultants with expertise in U.S. GAAP and SEC financial reporting standards to review and compile all financial information," the Company still expected "to be deficient in our internal controls over disclosure and procedures until sufficient capital is available to hire the appropriate internal accounting staff and individuals with requisite GAAP and SEC financial reporting knowledge."

63.     On October 1, 2018, the Company filed with the SEC a notification of its inability to timely file its Annual Report on Form NT 10-K "because the [Company] was not able [to] finalize its audited financial statements as of and for the fiscal year ended June 30, 2018 without unreasonable effort and expense."

64.     On November 14, 2018, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2018. In the 10-Q, the Company disclosed that CEO Leire and CFO Wolfe determined that the Company's disclosure controls and procedures remained ineffective due to ongoing material weaknesses in controls over financial reporting.

65.     On February 13, 2019, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended December 31, 2018 and disclosed that the material weaknesses in its internal controls persisted.

66.     On May 16, 2019, the Company filed with the SEC a notification of its inability to timely file its Quarterly Report on Form NT 10-Q "because it was not able to finalize its unaudited financial statements as of and for the fiscal quarter ended March 31, 2019 without unreasonable effort and expense."

67.     In all subsequent Quarterly Reports up until the present, the Company disclosed ongoing material weaknesses in its controls over financial reporting.

**D.      Enochian Makes False And Misleading Statements About Gumrukcu's Credentials, Expertise And Research**

68.     On October 1, 2018, Enochian filed with the SEC its Annual Report on Form 10-K for the fiscal year ended June 30, 2018 (the "2018 10-K").[3] The 2018 10-K disclosed that on July 9, 2018, the Company had entered into a consulting agreement with G-Tech Bio, LLC ("G-Tech"),

---

[3]     The 2018 10-K was signed by then-CEO Leire, then-CFO Wolfe, Defendants Sindlev, Grønfeldt-Sørensen, Sandler, Dybul, Sapirstein, and former Board member Evelyn D'an. Leire and Wolfe certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 3Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

a company controlled by Gumrukcu, to assist the Company with the "development of the gene therapy and autologous and allogenic cell therapy modalities for the prevention, treatment, amelioration of HIV in humans, and with the development of a genetically enhanced Allogenic Dendritic Cell for use as a wide spectrum platform for various diseases (including but not limited to cancers and infectious diseases)." The 2018 10-K further disclosed that "G-Tech is entitled to consulting fees for 20 months, with a monthly consulting fee of not greater than $130,000 per month," and is controlled by "certain members of Weird Science."

69.     On November 25, 2019, Enochian filed with the SEC a Current Report on Form 8-K attaching a press release announcing an agreement "to acquire an exclusive, license for a treatment under development aimed to treat the Hepatitis B Virus (HBV) infections from G-Tech Bio, LLC." The Company stated in the press release that one of the Company's lead drugs, "HV-01[,] was the original impetus for the conception of Enochian Biosciences' HIV focus," and that it was based "on an insight by Dr. Gümrükcü, drawn from a non-HIV field, that by adding an additional genetic modification to cells beyond those that protect cells from HIV infection could give a competitive advantage to the survival of the cells in HIV patients, leading to enhanced engraftment of the cells and increase the potential for a cure." Enochian represented that the approach could "significantly reduce the therapies needed, potentially allowing the procedure to be done on an outpatient basis," and noted the "innovative mechanism of action designed to be developed into a potential cure for HBV."

70.     Enochian described Gumrukcu in the press release as "the director of [SRI], a non-profit organization where he runs a research lab at the cutting edge of cell, gene and immunotherapy research," and represented the following regarding Gumrukcu's education and training:

> After receiving his preclinical training at the Dokuz Eylul University in 2004, [] Gümrükcü continued his training in various institutions and started working as a physician licensed by the Ministry of Health of Turkey in 2008. Later, after working under Dr. Suat Arusan in Turkey, Dr. Gümrükcü decided to explore further studies in the field of cell and gene therapies.

17

71.     Professor Shimon Slavin, who was purported to be Gumrukcu's mentor, was quoted in the press release as confirming the representations about Gumrukcu's education and training:  "Gümrükcü was a young post-doc with interesting ideas when I first met him eight years ago. I am looking forward to our future collaboration in developing and implementing novel cancer treatments at [SRI]." Slavin also quoted as pointing to Gumrukcu's "unique research training," remarking that "he has become a prolific inventor, submitting various patent/provisional patent applications, which include several approaches aimed to treat deadly diseases, and for a novel vaccine for HIV among many others. Dr. Gümrükcü has licensed intellectual property related to HIV and several solid tumors to Enochian."

72.     Defendant Dybul was quoted in the press release as stating: "Dr. Gümrükcü is one of those rare geniuses that is not bound by scientific discipline or dogma. He sees connections and opportunities often missed. His ideas are the purest kind: those that seem so obvious and simple once he has conceived of and explained them."

73.     On December 10, 2019, Enochian filed with the SEC a Current Report on Form 8-K attaching a press release announcing a novel approach to potentially curing the Hepatitis B virus: "…Gumrukcu, the inventor of products in the Enochian pipeline and Director of [SRI], presented the data at the HEP DART scientific conference in Kauai, Hawaii. The data were generated through a collaboration between SRI and Dr. Philippe Gallay of the Scripps Institute."

74.     On March 24, 2021, Enochian filed with the SEC a Current Report on Form 8-K attaching a press release announcing a breakthrough cancer treatment developed through a partnership between SRI and Enochian, which resulted in complete remission in a 36-year old patient with recurrent glioblastoma for a period of 15 months.  Enochian claimed that, "[i]n compliance with U.S. Food and Drug Administration guidance, SRI treated the patient with natural killer (NK) and dendritic cells (DC) from a relative who had a partial genetic mismatch."

75. On September 24, 2021, Enochian filed with the SEC an Annual Report on Form 10-K for the fiscal year ended June 30, 2021 (the "2021 10-K").[4] Enochian represented in the 2021 10-K that "[o]ur co-founder and inventor, [] Gumrukcu, who is also the Director of [SRI], submitted Pre-IND for ENOB-HV-21 an innovative treatment of Natural Killer (NK) and Gamma Delta T-Cells (GDT) collected from another person."

76. According to the 2022 Proxy Statement, G-Tech and SRI are controlled by Gumrukcu and on April 18, 2021, the Company entered into a Statement of Work and License Agreement, by and among the Company, G-Tech and SRI, whereby the Company acquired a perpetual sublicensable, exclusive license to research, develop, and commercialize certain formulations which are aimed at preventing and treating forms of pancoronavirus, paninfluenza, and combinations of the two diseases. As of June 30, 2021, the Company paid a $10 million up-front payment and $760,000 related to prior research costs to G-Tech and/or SRI. As of September 30, 2021, the Company paid an additional $75,000 to G-Tech and/or SRI.

## E. The Company Issues Shares

77. On June 16, 2021, the Company filed with the SEC a Form 424B5 (the "Prospectus") announcing entry into a definitive securities purchase agreement with several institutional investors for the issuance and sale of an aggregate of 3,866,667 shares, or about $29 million worth, of its common stock at a price of $7.50 per share. Enochian represented that it intended to use the net proceeds from the offering for working capital and general corporate purposes. The securities were being offered pursuant to Enochian's shelf registration statement on Form S-3 (File No. 333-239837) filed with the SEC on July 13, 2020, and declared effective on July 20, 2020.

---

[4] The 2021 10-K was signed by CFO Luisa Puche ("Puche") and all of the Individual Defendants. Defendant Dybul and Puche certified pursuant to SOX, that the 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2021 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

78.     In the Prospectus, the Company represented that it was "committed to using our genetically modified cell, gene, and immune therapy technologies to prevent or potentially cure HIV, HBV as well as to potentially provide life-long cancer remission of some of the deadliest cancers. We do this by genetically modifying, or re-engineering, different types of human immune cells, depending on the therapeutic area and then injecting or returning the reengineered cells into a patient with HIV or some cancers to provide treatment or potentially cure."

79.     The Company asserted that it planned to use the proceeds from the offering "to complete an exclusive license agreement to accelerate the development of an innovative technology to potentially treat and prevent all variants of COVID-19 and influenza viruses; and to advance two platform technologies with the potential to cure Hepatitis B Virus, HIV and many solid tumors beginning with pancreatic cancer; and for working capital and general corporate purposes."

80.     In the Prospectus, Enochian again disclosed its reliance on Gumrukcu and entities he controls: "[m]any of the techniques utilized in the development of our product candidates have been developed by [] Gümrükcü, and we rely on the services of Dr. Gümrükcü, and of [G-Tech] and [SRI], in the continued development of our pipeline. Our future performance will depend on our ability to retain the services of Dr. Gümrükcü, [G-Tech] and [SRI]. The loss of the services of any of the foregoing, or of any of our key employees or scientific advisory board members could impede the achievement of our research, development, regulatory approvals and commercialization objectives."

**F.     The Individual Defendants Knew The Risks Regarding The Company's Material Dependence On Gumrukcu**

81.     On September 23, 2020, Enochian filed with the SEC an Annual Report on Form 10-K for the period ended June 30, 2020 (the "2020 10-K").[5]

---

[5]     The 2020 10-K was signed by CFO Puche, Defendants Dybul, Sindlev, Grønfeldt-Sørensen, Sandler, Alton, Sapirstein, Brosgart, and former Board member Evelyn D'An. Defendant Dybul and Puche certified pursuant to SOX, that the 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the

82.     In the 2020 10-K, the Company disclosed that is "highly dependent" on Gumrukcu and entities he controls or is affiliated with:

> We are highly dependent on the services of third parties to conduct research and development of our pipeline, and our failure to maintain the services of such third parties could harm our business
>
> We are highly dependent on third parties working in conjunction with our officers, employees, scientific advisory board and research institutions in the research and development of product candidates in our pipeline. Many of the techniques utilized in the development of our product candidates have been developed by [] Gümrükcü, and we rely on the services of Dr. Gümrükcü, and of G-Tech Bio, LLC ["G-Tech"] and [SRI], in the continued development of our pipeline. Our future performance will depend on our ability to retain the services of Dr. Gümrükcü, [G-Tech] and SRI. The loss of the services of any of the foregoing, or of any of our key employees or scientific advisory board members could impede the achievement of our research, development, regulatory approvals and commercialization objectives.

83.     The 2021 10-K reiterated the risks in connection with Company's dependence on Gumrukcu and entities he controls or is affiliated with.

84.     Further, according to the 2021 10-K, "[o]ur future performance will depend on our ability to retain the services of [Gumrukcu], [G-Tech] and SRI. The loss of [their] services, or of any of our key employees or scientific advisory board members could impede the achievement of our research, development, regulatory approvals and commercialization objectives."

85.     The 2021 10-K discussed the Company's rights under license agreements with "our licensors, including Weird Science and G-Tech, SRI and [] Gumrukcu that are important to our business," stating that "[o]ur research and development platform is built, in part, around patent rights licensed from such licensors."

86.     On October 28, 2021, Enochian filed with the SEC an amended Annual Report on Form 10-K/A—signed by Defendant Dybul and Puche—amending the Company's 2021 Annual Report, which contained substantively the same statements as in the original Annual Report, pertaining to the Company's consulting and licensing agreements with G-Tech and SRI.

---

information contained in the 2020 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

### G.     Gumrukcu's Criminal Past And False Credentials Come To Light

87.     On May 25, 2022, Federal prosecutors announced the arrest and indictment of Gumrukcu as one of two men charged in a murder-for-hire conspiracy resulting in the death of Vermont resident Gregory Davis.[6] According to a press release[7] from the U.S. Attorney for the District of Vermont:

> The Office of the United States Attorney for the District of Vermont stated that Serhat Gumrukcu, 39, of Los Angeles, California . . . [was] arrested yesterday after having been charged by a federal grand jury in Vermont with conspiring to use interstate commerce facilities in the commission of murder-for-hire which resulted in the death of Gregory Davis, a resident of Danville, Vermont.

88.     Following news of Gumrukcu's arrest, on May 25, 2022, Enochian's stock price plunged 37%, losing $2.17 per share to close at $3.70 per share.

89.     On June 1, 2022, Hindenburg Research released a report[8] on Gumrukcu's false credentials, unorthodox and dangerous methods, criminal past, and the Company's ongoing cover-up of these facts.

90.     According to the report, at the time that Gumrukcu was arrested by federal authorities on January 6, 2018, he was 19 days away from trial on felony fraud charges related to a 2016 deal with the murder victim, Gregory Davis. Federal prosecutors assert that the prospective merger deal through which Enochian became a public company was the motive for the murder scheme.

91.     The Hindenburg Report noted that Enochian was now seeking to downplay Gumrukcu's role with the Company, claiming that Gumrukcu "has had no formal role in the Company," despite Enochian's own repeated disclosures indicating that the Company and its pipeline are **completely dependent** on Gumrukcu and that every product Enochian is developing

---

[6]     The case is *U.S. v. Serhat Gumrukcu*, Case No. 5:22-cr-00058 (D. Vt.).

[7]     https://www.justice.gov/usao-vt/pr/two-men-charged-murder-hire-conspiracy-resulting-death

[8]     Hindenburg Research, *Miracle Cures and Murder For Hire: How a Spoon-Bending Turkish Magician Built a $600 Million Nasdaq-Listed Scam Based On A Lifetime Of Lies*, https://hindenburgresearch.com/enochian/.

appears to have been licensed to it by Gumrukcu-controlled or affiliated entities or are otherwise based on his research.

92.     The Hindenburg Report revealed that Gumrukcu's criminal activities began in his native Turkey, where he **currently faces criminal charges** based on his August 2012 arrest for **falsely posing as a doctor** and charging a desperate family $275,000 to treat a terminally ill cancer patient, who subsequently died.

93.     The Hindenburg Report references a glowing letter of recommendation from Defendant Dybul about Gumrukcu that was included in the Turkish criminal court record. In the recommendation, Dybul invoked Gumrukcu's close friendship and mentee relationship with Dr. Anthony Fauci and his relationship with Bill Gates. Dybul called Gumrukcu a "rare genius" who discovered platforms to cure HIV, Hepatitis B, all strains of influenza, Zika, dengue fever, and COVID. Dybul also wrote that Gumrukcu was "deeply compassionate, empathetic, and approachable," providing his "strongest recommendation."

94.     The report details that Gumrukcu then fled Turkey despite the outstanding arrest warrant. Three years later, in August 2015, he sold similar "miracle" concoctions to the desperate parents of a young Pennsylvania boy who had terminal cancer, which resulted in litigation.

95.     In February 2017, Gumrukcu was reported to have been arrested by authorities after the State of California accused him of a slew of white-collar crimes, including fraud, identity theft, and check kiting—a total of 14 felonies. The authors of the report learned from California authorities that in January 2018, Gumrukcu paid over $1 million in restitution to victims to reduce his felony plea charge to a misdemeanor.

96.     Defendant Sindlev's DanDrit (Enochian's acquiror in January 2018) hired Gumrukcu as a consultant in April 2017, just two months after his arrest for the alleged crime spree. DanDrit and the Board moved forward with acquiring an interest in Gumrukcu-related entities and subsequently taking Enochian public despite knowing of the ongoing criminal charges, giving Gumrukcu and affiliates 50% of the combined company.

97.     As he awaited sentencing following pleading guilty to one felony, Gumrukcu attended the Nasdaq bell ringing ceremony for Enochian and was announced as Enochian's "scientific founder."

98.     Hindenburg reported that Enochian executives knew about Gumrukcu's criminal history. In a phone interview, Chairman Sindlev admitted to the authors of the report that he "knew that [Gumrukcu] had been charged for 14 (felony) counts," but moved forward with the deal and expanded the relationship anyway. In the years since, Enochian has awarded lucrative cash consulting and licensing contracts to entities controlled by Gumrukcu and his husband without disclosing Gumrukcu's criminal past to shareholders.

99.     The Hindenburg Report revealed that Enochian's former CEO, Leire, raised a red flag about Gumrukcu, asking "critical questions" about "serious financial improprieties" and large payments to Gumrukcu, and questioning the Company's close association with an individual accused of numerous felonies. Leire was subsequently terminated.

100.    Per the report, Gumrukcu continues to profit from his illegal actions through the sales of his unlicensed and unvetted "miracle" treatments to desperate parents of terminally ill children, bilking them of hundreds of thousands of dollars. His private practice's office is located in the same building as Enochian's headquarters.

101.    The report also revealed Gumrukcu's reported qualifications are false, "*[w]e have been unable to find any jurisdiction in which Gumrukcu is licensed as a medical doctor.* He is unlicensed in California, where he has apparently been practicing medicine anyway, and where he has claimed to have made his major breakthroughs for Enochian."

102.    Gumrukcu's education, credentials, and degrees are all *fictions* according to the extensive research conducted by the report's authors. Gumrukcu claims to have spent 12 or more years earning an M.D. and multiple PhDs in Russia and Turkey, however, he has no medical degree and no PhD. His name does not appear in the official Russian national degree database.  Gumrukcu was never enrolled in the Russian school he claims to have graduated from, as verified from correspondence with the institution. Russian border control and police have no record of

Gumrukcu ever having a Russian student visa or even a short-term tourist visa, let alone spending years studying medicine. Instead, Gumrukcu is reported to have purchased a fake Russian medical degree on the black market.[9]

103.   Gumrukcu claims to have received a PhD from a Turkish university that has no record of him. The Turkish medical school where he began undergraduate studies confirmed he had attended, but later dropped out before graduating.  Turkish criminal records show that Gumrukcu admitted to police that his highest level of education was a high school degree, despite the arrest taking place *after* the period where Gumrukcu claimed to have already been a doctor.

104.   The Hindenburg Report disclosed Gumrukcu's *actual* past.  As a local magician with the stage name "Dr. No," he studied and taught spoon-bending, firewalking, and performing as a mentalist, claiming magical healing powers.

105.   The Hindenburg Report declares that based "on our investigation, we strongly believe that Gumrukcu's education credentials are entirely fabricated. Consequently, we believe Enochian's claimed scientific breakthroughs have been developed by a fake doctor with a long criminal rap sheet who now stands accused of murder. "  Gumrukcu is a "a lifelong con artist, who has catapulted himself from being a small-town Turkish magician to leading a publicly traded, Nasdaq-listed medical research enterprise and fooling many along the way."

106.   According to the report, despite the Company's claims that top scientists back Gumrukcu's research, "many are already backing away." An international cancer doctor that Gumrukcu claimed was his mentor said a picture of him on the website for Gumrukcu's research entity, [SRI], is a fake: "I never wore [a] Seraph coat as shown in the picture, so how could I validate his science?"

107.   A microbiologist who served on Enochian's Scientific Advisory Board and was previously quoted by Enochian as saying he was "blown away" by Gumrukcu's "brilliant

---

[9]   As part of the research underlying the report, the authors purchased a similar black market Russian medical degree from the same school, with the same claimed major, the same date, and the same "official" stamp as Gumrukcu's with relative ease.

creativity" stated: "I agree retrospectively I should have done some due-diligence." On the validity of the science, he wrote: "I have never validated anything, and they should not use my name."

108.    A former Enochian senior executive explained that he left the Company "because I lost scientific trust in what [Gumrukcu] was promoting….I had a few facts that corroborated that he lied to me and when scientists start to lie a little bit and massage the data, then I am afraid to have *another Elizabeth Holmes story*."

109.    Ultimately, the Individual Defendants caused or authorized the payment of *an estimated $20 million* in cash to Gumrukcu through a series of license agreements, consulting contracts, and other related-party transactions. Gumrukcu and his spouse own the largest single stake in Enochian, about 32% of the company, worth about $90 million as of the date of the report.

110.    The Hindenburg Report closes with a dismal forecast for the Company: "With its founder and main source of scientific discoveries jailed on murder-for-hire allegations, this cash-burning company without peer-reviewed research and no genuine clinical prospects is now a 'catch me if you can' story that we believe has finally reached the end-phase."

111.    On June 28, 2022, *The Wall Street Journal* reported more details about Gumrukcu's fraudulent actions, criminal history, and the motivation behind Gumrukcu's alleged conspiracy to murder Gregory Davis.[10]

112.    The article explained that Gumrukcu arranged the murder to prevent Davis from exposing Gumrukcu as a fraud, a revelation which would have endangered the lucrative deal giving him a significant ownership stake in Enochian.

113.    Shortly after Davis's body was recovered, his wife, Melissa Davis, spoke with state police detectives and the FBI. According to court papers, Davis told his wife before he was killed that he had been involved in an oil deal involving Gumrukcu and his brother and that he no longer trusted them. Davis believed they owed him more than $900,000 for late fees and penalties.

---

[10]    Joseph Walker et al., *Past Catches Up To Biotech Wizard Charged in Murder*, https://www.wsj.com/articles/biotech-wizard-left-a-trail-of-fraudprosecutors-allege-it-ended-in-murder-11656339183.

114.    Davis had arranged to broker a deal to buy refined oil products and resell them at a profit in a deal valued between $20 million and $30 million, said a person familiar with the matter. The Gumrukcu brothers agreed to put up the cash in exchange for a percentage of the profit, providing bank documentation that Davis later discovered to be fraudulent.  Davis threatened to expose the fraudulent bank documentation provided by Gumrukcu and his brother to the FBI, according to a court filing by prosecutors.

115.    Federal prosecutors alleged that Gumrukcu sought to prevent Davis from exposing his fraudulent conduct in their dealings, which would jeopardize the lucrative merger with Enochian Biopharma that resulted in the formation of Enochian, which was undergoing due diligence at the time.

116.    Days before his arrest in May, Gumrukcu sold around 250,000 shares in Enochian for $2 million to Enochian's Board Chair, Defendant Sindlev, for $8 per share on a day when the Company's stock price never exceeded $6.26 per share.

117.    *The Wall Street Journal* reported that Enochian "paid more than $21 million to companies controlled by [] Gumrukcu and his husband for consulting, research and the licensing of potential drugs to treat influenza, hepatitis B, HIV and Covid-19."

118.    Defendant Sindlev attempted to back up Gumrukcu's credentials to *The Wall Street Journal*, stating that he believes that Gumrukcu holds a medical degree though he had not "personally checked it," and claiming that he was "in the process of doing so."

119.    *The Wall Street Journal* article revealed that the FBI spent more than four years on the Davis case, discovering other Gumrukcu criminal schemes, including a 2014 Southern California real-estate deal where he convinced a Turkish banker to invest $500,000 in a joint-venture to flip a nearby property.  In the next few months, the investor wired Gumrukcu $430,000 for renovations. After being told that the property was sold, the investor never received his expected share of the profits. He hired a private investigator and learned the escrow documents had been forged. The house was not purchased by Gumrukcu and had not been on the market. The

investor sued Mr. Gumrukcu and won damages in 2016. Gumrukcu's West Hollywood house was auctioned off to help pay the $1.8 million judgment, according to a county document.

120.    In connection with that case, as well as the passing of $600,000 in bad checks in the oil deal with Davis, Gumrukcu was arrested on February 9, 2017, and charged with 14 felony counts, including impersonating a lawyer and writing fraudulent checks.

121.    On January 25, 2018—nearly three weeks after Davis was killed—Gumrukcu pled guilty in Los Angeles to a felony for passing bad checks and was sentenced to five years of probation.

**H.    Enochian Admits That Gumrukcu Falsified Data**

122.    On July 1, 2022, Enochian filed with the SEC a Current Report on Form 8-K attaching a press release disclosing that Gumrukçu falsified data related to the Company's COVID-19 treatment and HBV therapy study by altering two different sets of animal data generated by third-party research institutions before Enochian's scientists reviewed them. Enochian represented that it intended to initiate legal action against Gumrukçu as a result of the falsification of the data. In the press release, the Company revealed that it had conducted a "rigorous internal review of scientific data," which led to the discovery of the falsified data.

123.    The Company noted that it was "extremely concerned and disappointed to learn that non-clinical data for those two pipelines were altered" and that it was "evaluating its internal controls regarding the review and verification of external scientific data …."

124.    Following the news about the falsified data, shares of Enochian fell 4.6% to $1.84 per share in after-hours trading on July 1, 2022.

**I.    Gumrukcu Reaped $2 Million In Insider- Sales Proceeds**

125.    As set forth herein, Gumrukcu possessed material, adverse information that he knew had not been publicly disclosed. On May 18, 2022, a mere week before his arrest on suspicion of conspiring in a murder plot, Gumrukcu consciously acted to exploit his knowledge by selling over $2 million of Enochian stock (253,943 shares) at artificially inflated prices while in possession of material, adverse non-public information.

**J.     Enochian Is Sued In Securities Class Action Lawsuits**

126.    On July 26, 2022, a securities class action complaint was filed, captioned *Chow v. Enochian Biosciences Inc., et al.*, No. 22-cv-01374-DMG-AFM (C.D. Cal.), on behalf of all purchasers of Enochian securities between September 24, 2020 and May 31, 2022.  *Chow* charges the Company, Defendants Dybul, Sindlev, Brosgart, Alton, Sapirstein, Sandler,  Grønfeldt-Sørensen, McNicol, as well as Enochian's CFO Luisa Puche, and former Board member Evelyn D'an with violations of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

127.    Chow alleges that the defendants made false and misleading statements and failed to disclose that: (i) Gumrukcu was not a licensed doctor and had no verifiable degrees beyond high school; (ii) there were no scientific and technological underpinnings to Enochian's product pipeline, purportedly invented by Gumrukcu; (iii) the commercial prospects for the Company's product pipeline were overstated; (iv) Gumrukcu had a criminal history that included fraud; and (v) reliance on Gumrukcu, and its consulting and licensing agreements with G-Tech and SRI, subjected the Company to a heightened risk of reputational and financial harm, as well as threatened the integrity of the Company's scientific findings.

128.    On July 28, 2022, a securities class action complaint was filed, captioned *Manici v. Enochian Biosciences Inc., et al.*, No. 22-cv-05237 (C.D. Cal.), on behalf of all purchasers of Enochian securities between January 17, 2018 and June 27, 2022, inclusive.  *Manici* charges the Company, Defendant Dybul, Leire, Robert Wolfe, Enochian's  former CFO and Chief Accounting Officer, and CFO Puche with violations of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

129.    *Manici* alleges that the defendants made false and misleading statements and failed to disclose that: (1) co-founder and inventor Gumrukcu was engaged in a variety of frauds; (2) Gumrukcu was not a licensed doctor; (4) Gumrukcu's purported contributions to the Company lacked a reasonable basis; (5) the Company had overstated its commercial prospects; and (6)

Gumrukcu had improperly diverted approximately $20 million from Enochian to entities he owned.

**K.    The Individual Defendants Ignored Red Flags Regarding Gumrukcu's Credentials, Expertise, And Research**

130.    The Board was presented with ample warning that Gumrukcu was a criminal with fraudulent credentials and that his scientific methods were suspect, but the Individual Defendants failed to act in response.

131.    In January 2018, Gumrukcu pleaded no contest to a felony stemming from allegations that he forged documents and email addresses, and stole identities, to take more than $1 million from a Turkish banker so that he and his spouse, an interior designer and large shareholder in Enochian, could buy and upgrade a bungalow in Los Angeles.[11] The charges led to a "raid that ended with Gumrukcu in handcuffs."[12] In a phone interview connected with the *Hindenburg Report*, Defendant Sindlev admitted to the authors of the report, that he "knew that [Gumrukcu] had been charged for 14 (felony) counts," but moved forward with the deal and expanded the relationship anyway.

132.    Red flags about Gumrukcu were raised by the Company's CEO Leire, who warned early on that Gumrukcu was a fraud. According to Leire, little could be verified about how much work Gumrukcu did in the research and development of the drugs licensed by Enochian; and Leire began to suspect that Gumrukcu had fabricated his resumé and held neither a medical degree nor a doctoral degree. Leire, a medical doctor and pharmaceutical-industry executive, said he was fired from his CEO job in 2019 after raising his concerns with the Enochian Board. Another former Enochian senior executive explained that he left the Company "because I lost scientific trust in what [Gumrukcu] was promoting…I had a few facts that corroborated that he lied to me and when

---

[11]    Caleb Hannan, *Enochian Biosciences: Stunning Murder Allegations Raise Fresh Questions about Company's Top Medical Mind*.

[12]    *Id.*

scientists start to lie a little bit and massage the data, then I am afraid to have another Elizabeth Holmes story."

133.    On November 19, 2019, *Seeking Alpha* published a research report[13] on Enochian, authored by White Diamond Research, concluding that the Company should be valued at no more than $0.25 per share or $10 million because, among other reasons, of questions about Gumrukcu, noting that Enochian's "lead scientist and inventor, has very little scientific experience and no published scientific papers as far as we know. He considers himself a mystic, performs magic tricks, and was accused of identity theft, grand theft, false impersonation, and plead guilty to commercial burglary in Los Angeles in 2018." According to the report, Gumrukcu was arrested in 2017, held on $625,000 bail, charged with grand theft, false impersonation, identity theft, commercial burglary, and other crimes in Los Angeles from 2014 through 2016, and pleaded no contest to commercial burglary in January 2018 and was sentenced to five years of probation.

134.    White Diamond Research reported that Gumrukcu was also a defendant in a civil complaint filed in the L.A. Superior Court in Santa Monica relating to a property dispute in which the Court issued a writ of execution against Gumrukcu for almost $1.8 million.

135.    Even more troubling, White Diamond Research reported that Gumrukcu's claimed medical degree was false because he was not listed as a student at the medical school he claimed to attend and Gurmrukcu's studies underlying Enochian's drug development were not published in a peer-reviewed journal. Gumrukcu's claim that he was a Nobel Prize nominee was patently incredible because his hypothesis for an HIV cure was only tested on mice.

136.    On December 5, 2019, in a follow-up research report,[14] *Seeking Alpha* noted that Gumrukcu was practicing medicine in California without a license, and allegedly committed "many white collar crimes between 2014 and 2016, and pleaded no contest to commercial burglary

---

[13]    https://seekingalpha.com/article/4307809-enochian-biosciences-is-house-of-cards-pipeline-is-entirely-pre-clinical-and-management.

[14]    https://seekingalpha.com/article/4310714-enochian-biosciences-story-just-gotten-even-bizarre.

in 2018." The report stated that "We found no evidence that he has earned an MD or PHD as has sometimes been claimed. We also haven't found any evidence of him doing any biotech research or publishing anything related to biotech." The follow-up report stated that an Enochian director, Dr. William A Haselstine, who the Company had just hired on November 14, 2019, resigned on November 22, 2019, shortly after the original *Seeking Alpha* report was released.

137.    The report concluded: "We, as well as other investors we know, have tried to contact Enochian with questions and they have not responded. The company's lack of transparency is a red flag."

138.    On May 9, 2020, the Danish publication *DR Viden* reported that several Danish doctors with knowledge of Gumrukcu's clinic, Seraph Medical, stated that there was no scientific evidence that the treatments Gumrukcu was offering worked and that Gumrukcu was not permitted to treat patients in his clinic because he was not a licensed physician.  Moreover, *DR Viden* reported that the family of at least one person that Gumrukcu treated was suing him after treatments of leeches, mistletoe extract, and so-called nck treatment, which is a form of immunotherapy against cancer, resulted in the patient's death. *DR Viden* reported that numerous Danish doctors warned patients against treatment by Gumrukcu or at Seraph Medical.

139.    The Individual Defendants ignored the red flags.  If the Individual Defendants had taken timely action, the damage caused to Enochian could have been prevented or, at least, minimized.

**L.    Enochian's False And Misleading Proxy Statements**

140.    On May 22, 2020, the Company filed its 2020 Proxy Statement with the SEC (the "2020 Proxy Statement") soliciting shareholder votes to, among other things, re-elect Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, and Grønfeldt-Sørensen to the Board.

141.    The 2020 Proxy Statement represented that the Board was exercising its risk oversight function directly and through the Audit Committee. It also provided that the Board "regularly discusses with management the Company's major risk exposures including compensation risk, their potential financial impact on the Company, and the steps taken to

monitor and control those risks." The 2020 Proxy Statement enumerated various related party transactions with Gumrukcu and entities controlled by him, but made no disclosure regarding Gumrukcu's criminal past, lack of credentials, and the lack of scientific merit in the technologies he purported to develop for the Company.

142.   On June 24, 2020, Enochian filed a Form 8-K disclosing that Defendants Sindlev, Dybul, Grønfeldt-Sørensen, Sapirstein, Sandler, Alton and Brosgart were reelected as directors pursuant to the Board's solicitation of votes therefor.

143.   On February 3, 2021, the Company filed its 2021 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, and Grønfeldt-Sørensen to the Board.

144.   The 2021 Proxy Statement represented that the Board was exercising its risk oversight function directly and through the Audit Committee. It also provided that the Board "regularly discusses with management the Company's major risk exposures including compensation risk, their potential financial impact on the Company, and the steps taken to monitor and control those risks." The 2021 Proxy Statement enumerated various related-party transactions with Gumrukcu and entities controlled by him, but made no disclosure regarding Gumrukcu's criminal past, lack of credentials, and the lack of scientific merit in the technologies he purported to develop for the Company.

145.   On March 5, 2021, Enochian filed a Form 8-K disclosing that Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, and Grønfeldt-Sørensen were reelected as directors pursuant to the Board's solicitations of votes therefor.

146.   On January 27, 2022, the Company filed its 2022 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, Grønfeldt-Sørensen, and McNicol to the Board.

147.   The 2022 Proxy Statement represented that the Board was exercising its risk oversight function directly and through the Audit Committee. It also provided that the Board "regularly discusses with management the Company's major risk exposures including

compensation risk, their potential financial impact on the Company, and the steps taken to monitor and control those risks." The 2022 Proxy Statement enumerated various related-party transactions with Gumrukcu and entities controlled by him, but made no disclosure regarding Gumrukcu's criminal past, lack of credentials, and the lack of scientific merit in the technologies he purported to develop for the Company.

148.    Each of the foregoing Proxy Statements was materially false and misleading and omitted material information.  In actuality, the Board and Audit Committee lacked necessary and adequate internal controls and failed to oversee the Company's major risk exposures and their potential impact upon the Company, notwithstanding the knowledge of at least some members of the Board that Gumrukcu had a criminal past and that his purported credentials were subject to serious doubt. The Individual Defendants failed to disclose the truth about Gumrukcu, his criminal past, lack of a medical degree, lack of a PhD, and lack of scientific training despite causing or authorizing the payment of over $20 million in Company funds to him and entities controlled by him.

149.    On March 16, 2022, Enochian filed a Form 8-K disclosing that Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, Grønfeldt-Sørensen, and McNicol were reelected as directors pursuant to the Board's solicitations of votes therefor.

## VI.    DEMAND FUTILITY ALLEGATIONS

150.    Plaintiff brings this action derivatively on behalf of Enochian to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' and Gurmrukcu's breaches of their fiduciary duties as directors, officers, and controlling shareholders of Enochian, abuse of control, gross mismanagement, and violations of sections 14 (a) and 20 (a) of the Exchange Act, as well as the aiding and abetting thereof.

151.    Enochian is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

152.    Plaintiff is, and has been at all relevant times, a stockholder of Enochian and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately

and fairly represent the interests of Enochian and its shareholders in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

153.    Under the circumstances presented herein, demand is futile and, thus, excused.

**A.    Demand Upon Defendant Sindlev Is Excused**

154.    As admitted by Enochian in its public filings, Sindlev is the co-founder and Chair of the Enochian Board of Directors since June 2018, and is therefore not independent. Indeed, Enochian's 2022 Proxy Statement does not list Sindlev as an independent director.

155.    Sindlev will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of January 24, 2022, Sindlev owned 9,702,808 shares—or 18.42%—of Enochian common stock. If Sindlev admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued.

156.    Further, if Sindlev acknowledged that directors, officers, or employees at Enochian engaged in the wrongdoing alleged, he would be acknowledging that he, as co-founder, Board Chair, and a controlling shareholder with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

157.    Sindlev has conflicts that demonstrate his lack of disinterest and independence. Indeed, Sindlev has a long-standing business relationship with Gumrukcu through investments in a number of Gumrukcu's companies since 2017 and utilizing Gumrukcu's services as a consultant.

158.    Sindlev approved the 2020-2022 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Further, Sindlev benefitted from the violation of section 14(a) of the Exchange Act pled herein by securing his re-election to the Enochian Board through the false and misleading statements and material omissions contained in the 2020-2022 Proxy Statements.

159.    Sindlev is a named defendant in one of the pending securities class action lawsuits. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

160.    Sindlev's admission that he knew Gumrukcu had been charged for 14 felony counts, but moved forward with the Enochian deal and expanded the financial relationship between Enochian and Gumrukcu anyway demonstrates that he is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.

161.    Defendants Sindlev and Grønfeldt-Sørensen have specific and long-standing business and personal relationships with each other which preclude them from acting in an independent and disinterested manner. Sindlev and Grønfeldt-Sørensen have worked closely together for more than ten years. Since 1997, Sindlev is the founder and prime operator of the RS Group Companies, family offices in Denmark with global investments in the real estate, charter, food & beverage, private hospital and biosciences industries bearing Sindlev's initials in their title. In October 2012, Grønfeldt-Sørensen was named CEO of RS Group ApS, RS Arving ApS, RS Family ApS, and RS Newton ApS.

162.    Sindlev is the founder and prime operator of Dr. Smood Group, Inc., since January 2014. Grønfeldt-Sørensen is a director of Dr. Smood Group, Inc., since January of 2014, when the company was founded by Sindlev.

163.    Finally, according to a *FinansWatch* article,[15] Sindlev and Grønfeldt-Sørensen have been friends for years. They both know each other from the Cannes area, where Grønfeldt-Sørensen lived in 2012, well before he joined Enochian, and are golfing buddies. In fact, Sindlev drew on Grønfeldt-Sørensen's services in connection with two housing transactions when the latter was still employed at Nykredit, before joining an RS company.

164.    Sindlev, as a director of Enochian, was required to, but failed to: (1) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (2) implement and maintain an effective system of internal controls

---

[15]    Kasper Kronenberg, *Pandora billionaire hires Nykredit's 'Frenchman,'* August 16, 2012, https://finanswatch-dk.translate.goog/Navne_og_job/Profiler/article4810111.ece?_x_tr_sl=da&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (3)  implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (4) take action when presented with red flags pointing to misconduct.

165.    Sindlev is neither disinterested nor independent. Any demand upon Defendant Sindlev is futile and, thus, excused.

**B.    Demand Upon Defendant Dybul Is Excused**

166.    As admitted by Enochian in its public filings, Dybul is the Company's CEO and principal executive officer since July 1, 2021. Prior to that, he was Executive Vice Chair of the Board of Directors since January of 2019, and a director since February of 2018.  He is therefore not independent. Indeed, Enochian's 2022 Proxy Statement does not list Dybul as an independent director.

167.    As an employee, Dybul derives substantially all of his income from his employment with Enochian, including a total compensation of $430,000 in base salary in 2021 alone. Thus, he could not consider a demand for action that might require him to sue directors that control his continued employment or fellow members of management with whom he works on a day-to-day basis.

168.    Dybul, as of January 24, 2022, owned 828,906 shares—or 1.55%—of Enochian common stock. He will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  If Dybul admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued. Further, if Dybul acknowledged that executives at Enochian had engaged in the wrongdoing alleged, he would be acknowledging that he, CEO of  the Company, either knew of the wrongdoing or should have known of the wrongdoing.

169.    Dybul approved the 2020-2022 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Further,

Dybul benefitted from the violation of section 14(a) of the Exchange Act pled herein by securing his re-election to the Enochian Board through the false and misleading statements and material omissions contained in the 2020-2022 Proxy Statements.

170.    Dybul is a named defendant in the pending securities class action lawsuits. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

171.    Dybul, as a director and officer of Enochian, was required to, but failed to: (1) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (2) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (4) take action when presented with red flags pointing to misconduct.

172.    Dybul is neither disinterested nor independent. Any demand upon Dybul is futile and, thus, excused.

**C.    Demand Upon Defendant Brosgart Is Excused**

173.    Defendant Brosgart is an Enochian director since December 2019 and Chair of Enochian's Scientific Advisory Board on HBV Cure and Intrivo Diagnostic's Scientific Advisory Board on COVID-19 diagnostic tests. Thus, she could not consider a demand for an investigation of her own failures to detect, or her decision to acquiesce in, Gumrukcu's long-running fraud.

174.    Brosgart, as of January 24, 2022, owned 41,049 shares of Enochian common stock. She will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. If Brosgart admitted that she, Enochian, or others engaged in misconduct, her investment in Enochian would be substantially devalued. Further, if Brosgart acknowledged that executives at Enochian had engaged in the wrongdoing alleged, she would be acknowledging

that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

175.    Brosgart approved the 2020-2022 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.  Further, Brosgart benefitted from the violation of section 14(a) of the Exchange Act pled herein by securing her re-election to the Enochian Board through the false and misleading statements and material omissions contained in the 2020-2022 Proxy Statements.

176.    Brosgart is a named defendant in one of the pending securities class action lawsuits.  As such, she is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

177.    Defendants Brosgart, Alton, and Sapirstein have long-standing business and personal relationships with each other which preclude them from acting in an independent and disinterested manner.  Brosgart and Sapirstein worked closely together for more than twenty years, starting from when they worked together at Gilead Sciences, Inc.,[16] on the development of tenofovir, and continuing when they worked together at Tobira Therapeutics, Inc.[17]  Then, toward the beginning of Sapirstein's tenure as CEO of ContraVir Pharmaceuticals, Inc., on January 20, 2015, he recruited Brosgart to work on ContraVir's Scientific Advisory Board to support the development of its targeted antiviral therapies.[18]  In the press release announcing Brosgart's hire, Sapirstein remarked: "*I am excited to work with Dr. Brosgart again* after working together at Gilead on the clinical development of tenofovir as well as on the Board of Tobira…. *There is no one I trust more than her* to provide advice and guidance, particularly for our HBV program, given her experience in this space."

---

[16]    Sapirstein was at Gilead from 2000 to 2002.  Brosgart was at Gilead between 1998 and 2009.

[17]    Sapirstein was founding CEO of Tobira from 2006 until 2016, when bought by Allergan plc.  Brosgart joined Tobira's board in 2009, staying until the buyout by Allergan.

[18]    *Bloomberg News* (February 4, 2015).

178.    Similarly, Defendant Alton worked at Gilead from 1999 through 2019.

179.    Brosgart, as a director of Enochian, was required to, but failed to: (1) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (2) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (4) take action when presented with red flags pointing to misconduct.

180.    Brosgart failed to uphold her additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Enochian's Corporate Governance Guidelines.

181.    Brosgart is neither disinterested nor independent. Any demand upon Brosgart is futile and, thus, excused.

**D.    Demand Upon Defendant Alton Is Excused**

182.    Defendant Alton is an Enochian director since December 2019 and, as of January 24, 2022, owned 41,049 shares of Enochian common stock. He will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. If Alton admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued. Further, if Alton acknowledged that executives at Enochian had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

183.    Alton approved the 2020-2022 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Further, Alton benefitted from the violation of section 14(a) of the Exchange Act pled herein by securing

his re-election to the Enochian Board through the false and misleading statements and material omissions contained in the 2020-2022 Proxy Statements.

184.    Alton is a named defendant in one of the pending securities class action lawsuits. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

185.    Defendants Brosgart, Alton, and Sapirstein have long-standing business and personal relationships with each other which preclude them from acting in an independent and disinterested manner,  as they all worked together at Gilead. Alton worked at Gilead from 1999 through 2019. Sapirstein was at Gilead from 2000 to 2002 and Brosgart was at Gilead between 1998 and 2009.

186.    Alton, as a director of Enochian, was required to, but failed to: (1) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (2) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (3)implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (4) take action when presented with red flags pointing to misconduct.

187.    As a member of the Audit Committee, Alton had duties regarding oversight of the risks facing the Company and Enochian's compliance with relevant laws, rules, and regulations. Alton utterly failed to perform these essential duties.

188.    Alton failed to uphold his additional obligations as Chair of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Enochian's Corporate Governance Guidelines.

189.    Alton is neither disinterested nor independent. Any demand upon Alton is futile and, thus, excused.

**E.       Demand Upon Defendant Sapirstein Is Excused**

190.    Defendant Sapirstein is an Enochian director since March of 2018 and, as of January 24, 2022, owned 75,502 shares of Enochian common stock. He will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. If Sapirstein admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued. Further, if Sapirstein acknowledged that executives at Enochian had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

191.    Sapirstein approved the 2020-2022 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Further, Sapirstein benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Enochian Board through the false and misleading statements and material omissions contained in the 2020-2022 Proxy Statements.

192.    Sapirstein cannot be independent and disinterested in the face of a shareholder demand because he is a named defendant in one of  the pending securities class action lawsuits. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

193.    Defendants Brosgart, Alton, and Sapirstein have long-standing business and personal relationships with each other which preclude them from acting in an independent and disinterested manner.  Brosgart and Sapirstein worked closely together for more than twenty years, starting from when they worked together at Gilead, on the development of tenofovir, and continuing when they worked together at Tobira. Then, toward the beginning of Sapirstein's tenure as CEO of ContraVir, on January 20, 2015, he recruited Brosgart to work on ContraVir's Scientific Advisory Board to support the development of its targeted antiviral therapies. In the press release announcing Brosgart's hire, Sapirstein remarked: "I ***am excited to work with Dr. Brosgart again*** after working together at Gilead on the clinical development of tenofovir as well as on the Board

of Tobira…. ***There is no one I trust more than her*** to provide advice and guidance, particularly for our HBV program, given her experience in this space."

194.    Similarly, Alton worked at Gilead from 1999 through 2019.

195.    Sapirstein, as a director of Enochian, was required to, but failed to: (1) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (2) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (4) take action when presented with red flags pointing to misconduct.

196.    Moreover, as a member of the Audit Committee, Sapirstein had duties regarding oversight of the risks facing the Company and Enochian's compliance with relevant laws, rules, and regulations. Sapirstein utterly failed to perform these essential duties.

197.    Sapirstein is neither disinterested nor independent. Any demand upon Sapirstein is futile and, thus, excused.

F.    **Demand Upon Defendant Grønfeldt-Sørensen Is Excused**

198.    Defendant Grønfeldt-Sørensen is an Enochian director since October 2017 and, since January 24, 2022, owned 77,269 shares of Enochian common stock. He will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. If Grønfeldt-Sørensen admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued. Further, if Grønfeldt-Sørensen acknowledged that executives at Enochian had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

199.    Grønfeldt-Sørensen approved the 2020-2022 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Further, Grønfeldt-Sørensen benefitted from the violation of section 14(a) of the Exchange Act pled herein by securing his re-election to the Enochian Board through the false and misleading statements and material omissions contained in the 2020-2022 Proxy Statements.

200.    Grønfeldt-Sørensen is a named defendant in one of the pending securities class action lawsuits. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

201.    Defendants Sindlev and Grønfeldt-Sørensen have specific and long-standing business and personal relationships with each other which preclude them from acting in an independent and disinterested manner. Sindlev and Grønfeldt-Sørensen have worked closely together for more than ten years. Since 1997, Sindlev is the founder and prime operator of the RS Group Companies, family offices in Denmark with global investments in the real estate, charter, food & beverage, private hospital and biosciences industries bearing Sindlev's initials in their title. In October 2012, Grønfeldt-Sørensen was named CEO of RS Group ApS, RS Arving ApS, RS Family ApS, and RS Newton ApS.

202.    Sindlev is the founder and prime operator of Dr. Smood Group, Inc. since January 2014. Grønfeldt-Sørensen is a director of Dr. Smood Group, Inc. since January of 2014, when the company was founded by Sindlev.

203.    Finally, according to a FinansWatch article, Sindlev and Grønfeldt-Sørensen have been friends for years. They  know each other from the Cannes area, where Grønfeldt-Sørensen lived in 2012, well before he joined Enochian, and are golfing buddies. In fact, Sindlev drew on Grønfeldt-Sørensen's services in connection with two housing transactions when the latter was still employed at Nykredit, before joining an RS company.

204.    Grønfeldt-Sørensen, as a director of Enochian, was required to, but failed to: (1) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (2) implement and maintain an effective system of

internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (4) take action when presented with red flags pointing to misconduct.

205.    Grønfeldt-Sørensen is neither disinterested nor independent. Any demand upon Grønfeldt-Sørensen is futile and, thus, excused.

### G.    Demand Upon Defendant McNicol Is Excused

206.    Defendant McNicol is an Enochian director and Chair of its Audit Committee since May 2021. If McNicol admitted that she, Enochian, or others engaged in misconduct, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

207.    McNicol approved the 2020-2022 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

208.    McNicol benefitted from the violation of section 14(a) of the Exchange Act pled herein by securing her re-election to the Enochian Board through the false and misleading statements and material omissions contained in the 2020-2022 Proxy Statements.

209.    McNicol is a named defendant in one of the pending securities class action lawsuits. As such, she is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

210.    McNicol, as a director of Enochian, was required to, but failed to: (1) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (2) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (3)

implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (4) take action when presented with red flags pointing to misconduct.

211.    As Chair of the Audit Committee, McNicol had duties regarding oversight of the risks facing the Company and Enochian's compliance with relevant laws, rules, and regulations. McNicol utterly failed to perform these essential duties.

212.    McNicol is neither disinterested nor independent. Any demand upon McNicol is futile and, thus, excused.

### H.    Other Factors Demonstrating That Demand Upon The Individual Defendants Is Futile

213.    Enochian has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

214.    The Board was put on notice of legal and ethical violations at Enochian, and breaches of its Code of Conduct, as well as other misconduct, but failed to act against those responsible.  Timely action could have prevented, or at least minimized, the damage caused to Enochian by such misconduct.

215.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

216.    Publicly traded companies such as Enochian typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose

a recovery from the insurers if the Individual Defendants sue each other to recover Enochian's damages.

**COUNT ONE**
**(Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act)**

217.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

218.    The section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

219.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

220.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

221.    The 2020-2022 Proxy Statements were materially false and misleading and omitted material information. In actuality, the Board and Audit Committee lacked necessary and adequate internal controls and failed to oversee the Company's major risk exposures and their potential impact upon the Company, notwithstanding the knowledge of at least some members of the Board

that Gumrukcu had a criminal past and that his purported credentials were subject to serious doubt. The Individual Defendants failed to disclose the truth about Gumrukcu, his criminal past, lack of a medical degree, lack of a PhD, and lack of scientific training despite causing or authorizing the payment of over $20 million in Company funds to him and entities controlled by him.

222.    The false and misleading information contained in the 2020-2022 Proxy Statements was material to Enochian's shareholders in determining whether to elect the relevant directors to the Board.

223.    The material misstatements and omissions in the Proxy Statements damaged the Company.

224.    Plaintiff, on behalf of Enochian, seeks relief for damages inflicted upon the Company based on the false and misleading Proxy Statements in connection with the improper election of the members of the Board in each respective year.

**COUNT TWO**
**(Against the Individual Defendants for**
**Violations of Section 20(a) of the Exchange Act)**

225.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

226.    Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."

227.    The Individual Defendants, by virtue of their positions with Enochian, their significant share ownership of Enochian stock, and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Enochian and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Enochian to engage in the illegal conduct and practices complained of herein.

228.    The misleading information contained in the 2020-2022 Proxy Statements constitute material misstatements and omissions which have damaged the Company.  As controlling persons, the Individual Defendants are liable for the primary violations and Plaintiff, on behalf of Enochian, seeks relief for damages inflicted upon the Company based on the misleading 2020-2022 Proxy Statements.

**COUNT THREE**
**(Against the Individual Defendants for Breach of Fiduciary Duties)**

229.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

230.    The Individual Defendants owed and owe fiduciary duties to Plaintiff and Enochian's shareholders.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe to Plaintiff and Enochian's shareholders the highest obligation of good faith, loyalty, and due care.

231.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of Enochian in a manner consistent with the duties imposed upon them by law.

232.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Enochian's affairs and in the use and preservation of Enochian's assets.

233.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Enochian has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages include, among other things, the costs of defending and resolving the securities class actions.

234.    As a result of the misconduct alleged herein, the Individual Defendants are liable to Plaintiff and the Company's shareholders.

1

### COUNT FOUR
### (Against Gumrukcu for Breach of Fiduciary Duties)

235.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

236.    As a controlling shareholder, Gumrukcu owed a fiduciary duty of fairness in his financial dealings with the Company.

237.    Gumrukcu, by his actions and by engaging in the wrongdoing described herein, abandoned, abdicated, and breached his fiduciary responsibilities and duties.

238.    As a direct and proximate result of Gumrukcu's failure to perform his fiduciary obligations, Enochian has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

239.    As a result of the misconduct alleged herein, Gumrukcu is liable to Plaintiff and the Company's shareholders.

### COUNT FIVE
### (Against the Individual Defendants and Gumrukcu
### for Contribution and Indemnification)

240.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

241.    The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants and Gumrucku.

242.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' and Gumrucku's actions. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants and Gumrucku on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' and Gumrucku's actions.

### COUNT SIX
### (Against the Individual Defendants and Gumrukcu
### for Aiding and Abetting)

243.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

244.     Each of the Individual Defendants and Gumrucku has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants and Gumrucku are in breach of their duties to the Company and have participated in such breaches of duties.

245.     In committing the wrongful acts, each of the Individual Defendants and Gumrucku have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants and Gumrucku also aided and abetted, and/or assisted, each other in breaching their respective duties.

246.     Because the actions described herein occurred under their supervision and authority, each of the Individual Defendants and Gumrucku played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

247.     Each of the Individual Defendants and Gumrucku aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT SEVEN**
**(Against the Individual Defendants**
**for Gross Mismanagement)**

248.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

249.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal controls of the Company.

250.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

251.    During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Enochian and its shareholders, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants violated sections 14(a) and 20(a) of the Exchange Act;

C.    Declaring that the Individual Defendants and Gumrukcu have breached, and aided and abetted the breach of their fiduciary duties to Enochian and its shareholders;

D.    Declaring that the Individual Defendants have grossly mismanaged Enochian;

E.    Determining and awarding to Enochian the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Gumrukcu, jointly and severally, together with pre-judgment and post-judgment interest thereon;

F.    Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and Gumrukcu due to their wrongful conduct and breach of their fiduciary and contractual duties, as well as any proceeds reaped through improper insider trading;

G.    Awarding Enochian restitution from the Individual Defendants and Gumrukcu, and each of them;

H.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.      Granting such other and further relief as the Court may deem just and proper.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: September 23, 2022

**WEISS LAW**
Joel E. Elkins (SBN 256020)
By: */s/ Joel E. Elkins*
Joel E. Elkins
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: (310) 208-2800
Facsimile: (310) 209-2348
Email: jelkins@weisslawllp.com

*Attorneys for Plaintiff*

**OF COUNSEL**

WEISS LAW
David C. Katz
Mark D. Smilow
Joshua M. Rubin
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
          msmilow@weisslawllp.com
          jrubin@weisslawllp.com

*Plaintiff's Counsel*

## VERIFICATION

I, Samuel I. Koenig, hereby verify that I have held stock in Enochian Biosciences Inc. ("Enochian" or the "Company") since November 26 and December 10, 2021. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of Enochian. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Samuel I. Koenig (Sep 20, 2022 18:21 EDT)

Samuel I. Koenig